**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANE P.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 0782** |
| | ) | |
| **ANDREW M. SAUL,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Diane P. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"). (Doc. 1). The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 9, 11). Plaintiff filed a brief arguing that the Commissioner's decision should be reversed or the case should be remanded, and the Commissioner responded with a competing motion for summary judgment. (Docs. 14, 21, 22). After careful review of the record and the parties' respective arguments, the Court concludes that the case must be remanded for further proceedings as outlined below. The Court therefore denies the Commissioner's motion and grants Plaintiff's request for remand.

## BACKGROUND

### I. Procedural History

Plaintiff applied for DIB on May 24, 2016, alleging disability since February 25, 2016 due to osteoarthritis and complex regional pain syndrome ("CRPS") in the upper

extremities.  (R. 50-51, 58-60, 68, 72, 93-94, 166-67, 177, 180, 205, 223).  Born in 1965, Plaintiff was 51 years old at the time of the alleged onset date (R. 50, 59, 166-67, 177, 205, 223), which is defined as an individual closely approaching advanced age.  20 C.F.R. § 404.1563(d).  Her date last insured is December 31, 2020.  (R. 50, 59, 72, 177, 205, 223).

The Social Security Administration denied Plaintiff's application initially on August 25, 2016 and on reconsideration on December 6, 2016.  (R. 58, 68, 88-90, 96-98). Plaintiff then requested a hearing, which was later held before Administrative Law Judge ("ALJ") Robert Asbille on March 23, 2018, where Plaintiff was represented by an attorney. (R. 20, 22, 72, 100-01, 158-60).  Plaintiff, Medical Expert ("ME") Ashok Jilhewar, M.D., and Vocational Expert ("VE") Richard Fisher testified at the hearing.  (R. 20, 22, 27-49, 72).

The ALJ denied Plaintiff's claims in a decision dated June 26, 2018.  (R. 72-78). The ALJ found that Plaintiff's morbid obesity, bilateral shoulder pain, and CRPS are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 74).  The ALJ concluded that Plaintiff was not disabled from her February 25, 2016 alleged onset date through the date of the decision because she retains the residual functional capacity ("RFC") to perform sedentary work with physical limitations, as described to the VE, and is capable of performing past relevant work.  (R. 72, 74, 77-78).  The Appeals Council denied Plaintiff's request for review on October 10, 2018 (R. 1-6), rendering the ALJ's June 2018 decision

the final decision of the Commissioner reviewable by this Court.  *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).[1]

In support of her request for reversal or remand, Plaintiff argues that the ALJ erred in: (1) examining whether Plaintiff's impairments met or equaled a listed impairment; (2) evaluating the opinion evidence; (3) determining her RFC; and (4) assessing her subjective symptom allegations.  As explained below, the Court concludes that remand is required for the ALJ to reexamine the applicability of the Listings.

## II.    Medical and Other History

Plaintiff completed high school.  (R. 28, 181).  As of the date of the hearing, she lived in an apartment with her husband and had no children.  (R. 27-28).  Plaintiff had not worked since February 25, 2016.  (R. 28, 180).  She previously worked as a claims clerk since October 2000.  (R. 29, 181).

Plaintiff saw Timothy Lubenow, M.D. for pain management from 2015 to 2017 (both before and after the February 25, 2016 alleged onset date).  (R. 264-87, 295-300, 304-08, 343-48, 358).  In August 2015, Plaintiff told Dr. Lubenow that, although she typically experienced pain mostly in her upper arms and neck, recently she had increased pain in her hands and wrist, and her "sedentary job typing for around [eight] hours a day. . . [was] exacerbating her pain."  (R. 286).  She reported getting "good coverage" from her spinal cord stimulator and using it frequently, but review revealed use only 9% of the time. (R. 286).  Plaintiff had discontinued one medication (Pristiq) due to cost, and, while other medications (Norco and Topamax) helped, she "had trouble tolerating them due to

---

[1]      The Appeals Council also granted Plaintiff an additional 30 days to file a civil action.  (R. 8-10; Doc. 1, at ¶ 5).

nausea." (R. 286).[2] On examination, Dr. Lubenow observed "hypersensitivity" and "strength 5/5" in both upper extremities. (R. 286). He assessed CRPS affecting both upper arms, instructed Plaintiff to increase use of the stimulator to 50%, prescribed medications for CRPS (Celebrex) and nausea (Zofran), refilled other medications (including Norco), and listed Norco as a current medication. (R. 286-87).

In September 2015, Plaintiff complained to Dr. Lubenow of new sudden onset right shoulder pain with weakness of abduction. (R. 284). She had been home from work for one week, she got no relief from icing and showering, and Norco was not helping. (R. 284). Plaintiff's stimulator was reprogrammed to try to get "better coverage" from the shoulder to neck, but it provided "perfect coverage" in the arms. (R. 284). Examination showed right shoulder pain, impingement, and tenderness. (R. 284). In addition to CRPS, Dr. Lubenow assessed carpal tunnel syndrome, rotator cuff arthropathy, rotator cuff sprain and strain, and rotator cuff disorder. (R. 284-85). He prescribed a CT arthrogram of the right shoulder, physical therapy for four weeks, no work for one week, and medication for CRPS (Medrol), and he refilled the prescription for Norco and listed Norco as a current medication. (R. 284-85).

In October 2015, with respect to CRPS, Plaintiff reported to Dr. Lubenow that she had "adequate pain coverage" and "tolerable" pain, she could perform activities of daily living and type for work, and "[o]verall, [she was] satisfied." (R. 281). No program change was made to the stimulator. (R. 282). But Plaintiff's right shoulder pain was getting worse, she felt soreness and a "tearing" sensation inside the joint, and she had stopped physical

---

[2]     Norco is a brand name of the generic drug Hydrocodone-Acetaminophen. *See* WEBMD, https://www.webmd.com/drugs/2/drug-63/norco-oral/details (last visited July 20, 2020). It is a combination opioid (Hydrocodone) and non-opioid (Acetaminophen) pain reliever. *Id.*

therapy after being "told she had a tear[.]" (R. 278, 281).[3] She was taking Norco. (R. 281). Dr. Lubenow observed right shoulder tenderness, 4/5 shoulder strength, active raising of the right shoulder 100 degrees anteriorly, pain with rotation, and no crepitus. (R. 281). In addition to CRPS, Dr. Lubenow assessed superior glenoid labrum lesion of the right shoulder based on CT results. (R. 281-82; *see* R. 348). He prescribed medication for CRPS (Mobic), refilled other medications (including Norco), and listed Norco as a current medication. (R. 281-82). Dr. Lubenow recommended surgical evaluation of the right shoulder by an orthopedic physician. (R. 282).

Orthopedic surgeon James Hill, M.D. evaluated Plaintiff in November 2015 for right shoulder pain. (R. 362-69, 378). On a medical history form, Plaintiff listed her medications, including Hydrocodone/Acetaminophen. (R. 362, 364). On examination, she had "pain on extremes of cervical range of motion in any direction[,]" and Hawkin's and Neer's impingement signs as well as Speed's maneuver "reproduced her pain." (R. 365). Imaging showed "distinct narrowing" at the acromioclavicular joint, but no other arthritic changes or bony lesions. (R. 366, 378). Dr. Hill's impression was chronic right shoulder pain of uncertain etiology with the possibility of rotator cuff impingement syndrome or acromioclavicular joint arthritis. (R. 366). Plaintiff was not a candidate for MRI because of the stimulator. (R. 366). Dr. Hill recommended cortisone injection therapy and administered an injection. (R. 366). In the event Plaintiff "receive[d] significant benefit" from the injection, Dr. Hill also prescribed physical therapy focusing on rotator cuff strengthening exercises. (R. 366).

---

[3] Physical therapy records dated December 2015 note that, following a surgical consultation, Plaintiff no longer wanted to attend physical therapy and gave no "further reason." (R. 333).

In January 2016, Plaintiff complained to Dr. Lubenow of increased right shoulder pain with lifting objects, new onset left shoulder pain, increased bilateral wrist and elbow pain, and difficulty sleeping and laying on her right side. (R. 278). She took Norco at night and experienced nausea from Topamax. (R. 278). Plaintiff performed activities of daily living, had "good coverage" from the stimulator, and denied numbness and tingling in both upper extremities. (R. 278). Dr. Lubenow observed right shoulder tenderness, active raising of the right shoulder 100 degrees anteriorly, pain with rotation, "TTP over R/L antecubital fossa[,]" and positive Tinel sign of the right wrist. (R. 278).[4] Dr. Lubenow noted that, following evaluation by an orthopedic surgeon, right shoulder surgery was not planned because imaging revealed no rotator cuff tear. (R. 278-79). He continued to assess CRPS, for which he prescribed medications (Tramadol and Nabumetone), and superior glenoid labrum lesion of the right shoulder, and he listed Norco as a current medication. (R. 279).

After the February 25, 2016 alleged onset date, in April 2016, Dr. Lubenow noted that Plaintiff got "good coverage" from the stimulator, and she took Norco at night but experienced nausea from Topamax. (R. 276). Plaintiff had "worsening" pain, noted difficulty sleeping and laying on her right side, was unable to perform activities of daily living, and had applied for disability benefits. (R. 276). She had been referred to an orthopedic physician and received a cortisone shot for right shoulder pain, which provided "some relief for a short period of time." (R. 276). Dr. Lubenow continued to observe right shoulder tenderness, active raising of the right shoulder 100 degrees anteriorly, pain with

---

[4] This (and subsequent) treatment notes say ". . . + Tinel sign R wrist, L wrist, no tenderness, swelling, redness." (R. 278; *see also* R. 276, 306). As such, other than positive Tinel sign of the right wrist, it is not readily apparent which findings applied to which wrist.

rotation, "TTP over R/L antecubital fossa[,]" and positive Tinel sign of the right wrist. (R. 276). The assessments remained the same. (R. 276-77). Dr. Lubenow refilled medications (including Norco). (R. 277).

In August 2016, Plaintiff complained to Dr. Lubenow of incisional pain following a procedure to replace the stimulator battery. (R. 277, 304, 306-08). The stimulator was "covering pain." (R. 306). Plaintiff was "unable to find a comfortable position to sit of [sic] sleep." (R. 306). She took Norco daily. (R. 306). Dr. Lubenow again observed right shoulder tenderness, active raising of the right shoulder 100 degrees anteriorly, pain with rotation, "TTP over R/L antecubital fossa[,]" and positive Tinel sign of the right wrist. (R. 306). The assessments were unchanged. (R. 306). Dr. Lubenow prescribed medication (Lunesta), refilled other medications (including Norco), and listed Norco as a current medication. (R. 306-07).

In November 2016, Plaintiff told Dr. Lubenow that she had occasional incisional pain. (R. 304-05). She had "some pain relief from her stimulator but she continue[d] to have pain through it[,]" and it did "not seem to be covering all of her pain." (R. 304). Plaintiff "continue[d]" to take Norco daily for "chronic shoulder pain related to a tear." (R. 304). Dr. Lubenow noted right shoulder tenderness and active raising of the right shoulder 100 degrees anteriorly. (R. 304). He continued to assess CRPS and superior glenoid labrum lesion of the right shoulder. (R. 304). Dr. Lubenow refilled medication, but noted "[n]o [prescription] for Norco today" and did not list Norco as a current medication. (R. 304-05). Plaintiff's stimulator was reprogrammed, and she stated that it felt "better at this point in time." (R. 305). Based on Plaintiff's neuropathic symptoms, Dr.

Lubenow recommended she see her primary care physician for evaluation for early onset diabetes. (R. 305).

In April 2017, Plaintiff complained to Dr. Lubenow of increased pain in her fingers, wrists, and arms up to her elbows. (R. 343). The stimulator provided "some pain relief[,]" but she still experienced "pain through it" and had to turn it down at night because she felt as though she was "being electrocuted." (R. 343). She had not been able to sleep well. (R. 343). Plaintiff "continue[d]" to take Norco daily for "[bilateral] arm pain." (R. 343). Other medication (Topiramate) caused nausea. (R. 343). Dr. Lubenow continued to note right shoulder tenderness and active raising of the right shoulder 100 degrees anteriorly. (R. 343). He added an assessment of bilateral median neuropathy and again recommended evaluation for early onset diabetes. (R. 343-44). Dr. Lubenow refilled medications (including Norco), listed Norco as a current medication, decreased Topiramate due to side effects, and prescribed Lunesta for difficulty sleeping. (R. 343-44). According to a toxicology report requested by Dr. Lubenow, in April 2017, Plaintiff tested positive for Hydrocodone (Norco). (R. 358).

Dr. Lubenow also completed a questionnaire in April 2017, stating that he had treated Plaintiff since September 2001 (though treatment prior to 2015 is not documented in the administrative record) and saw her every three months. (R. 314-20). Plaintiff's bilateral upper extremity CRPS could reasonably be expected to produce pain, and her ongoing impairments were expected to last at least 12 months. (R. 314). She experienced "[d]aily/constant" "[n]europathic pain, sharp, shooting, burning" in her bilateral upper extremities. (R. 315-16). Dr. Lubenow stated that Plaintiff was "not capable of tolerating even sedentary work[.]" (R. 320). He opined that she could perform

a job sitting for one hour and standing or walking for less than one hour. (R. 318). Plaintiff needed to get up from a seated position every 30 minutes for five to ten minutes before returning to a seated position. (R. 318). She could occasionally lift or carry up to five pounds, but never/rarely lift or carry five or more pounds; never/rarely grasp, turn, and twist objects with both hands; never/rarely perform fine manipulations with both hands; and never/rarely use both arms for reaching, including overhead. (R. 318-19).

Plaintiff saw Dr. Lubenow in August 2017 and reported getting 70 to 80% relief from the stimulator, but "continue[d] to have pain through it." (R. 345). She had increased left shoulder pain for three to four months "without any known cause[,]" and she rated the pain 10/10. (R. 345). Her right upper extremity was not as bad as her left, the right shoulder bothered her most, and she rated the pain 6/10. (R. 345). It had been "hard to sleep due to pain and do activities of daily living." (R. 345). She "continue[d]" to take Norco daily for "[bilateral] arm pain." (R. 345). Dr. Lubenow observed intact right shoulder range of motion and 5/5 strength; and left shoulder abduction of less than 90 degrees, 4/5 strength, "TTP over left AC", and positive Neer and Jobe signs. (R. 345-46). In addition to CRPS, superior glenoid labrum lesion of the right shoulder, and median neuropathy, Dr. Lubenow assessed subacromial tendinitis of the left shoulder and administered an injection, after which Plaintiff noted 70% relief. (R. 346). He also prescribed medication (Meloxicam), continued other medications (including Norco), and listed Norco as a current medication. (R. 345-46).

Dr. Hill evaluated Plaintiff in October 2017 for left shoulder pain. (R. 321-29). On a medical history form, Plaintiff listed her medications, including Hydrocodone/Acetaminophen. (R. 324, 326-27). She reported undergoing a cortisone

injection that "failed to provide any significant relief" and not receiving physical therapy. (R. 321). On examination, Plaintiff had "diffuse and obviously hyperexaggerated pain withdrawal response to light touch[,]" "marked limitations in all directions" of active range of motion, "mild diffuse limitations" of passive range of motion, and "diffuse weakness on rotator cuff strength testing and deltoid strength testing all graded as no better than 3/5." (R. 321). Imaging "fail[ed] to demonstrate" arthritic changes, bony lesions, proximal humeral migration, or soft tissue calcification. (R. 321, 323). Dr. Hill's impression was chronic left shoulder pain of uncertain etiology with the possibility of rotator cuff pathology or cervical radiculopathy. (R. 321). Plaintiff was not a candidate for MRI because of the stimulator (as Dr. Hill previously noted in 2015) and elected to proceed with an ultrasound, and further treatment would be based on those results. (R. 321-22).

In November 2017, Plaintiff went to the emergency room after passing out at home and, after a few days, was discharged in good condition and diagnosed with uncontrolled diabetes, vasovagal syncope, "polypharm for chronic back pain[,]" hypertension, obesity, and right knee contusion. (R. 382-437).

## III. Consultative Examination

On July 25, 2016, Mahesh Shah, M.D. performed an internal medicine consultative examination. (R. 288-94). Plaintiff complained to Dr. Shah of pain in her right upper extremity, particularly the right shoulder, and pain when laying on her right side. (R. 289). She could not lift anything heavy with her right hand, do any daily household chores with her right hand, or sleep on her right side. (R. 289). Dr. Shah listed Plaintiff's medications, including Hydrocodone. (R. 289).

X-rays of the right shoulder were normal. (R. 294). On examination, Dr. Shah noted marked tenderness and slow but preserved range of motion in Plaintiff's right shoulder; tenderness all over her right upper extremity; right hand grip, finger grasp, and motor strength of 4/5; left hand grip strength and power of 5/5; and difficulty with fine and gross manipulations due to right arm pain. (R. 291, 293). Plaintiff had normal gait, did not use assistive devices, moved around the office without difficulty, got up from a chair and on and off the examining table, and went from a seated to supine position and got up from a supine position without difficulties. (R. 289-91). Dr. Shah listed Plaintiff's problems as CRPS affecting the right side, pain in the right shoulder, high blood pressure under fair control, and obesity. (R. 291).

## IV. State Agency Reviewing Physician Opinions

On August 8, 2016, Calixto Aquino, M.D. opined that Plaintiff could occasionally lift or carry 20 pounds; frequently lift or carry ten pounds; stand, walk, or sit for a total of about six hours; frequently push or pull with the right upper extremity; and frequently reach in any direction, handle, or finger with the right arm/hand. (R. 54-55). On December 2, 2016, James Madison, M.D. rendered the same opinion. (R. 64-66).

## V. Administrative Hearing

On March 23, 2018, Plaintiff appeared with counsel at a hearing before ALJ Asbille. (R. 20, 22, 72). Plaintiff testified that she could not work because she could not meet the production requirements of her job due to CRPS in both arms, hands, and wrists from "being on the computer eight hours a day[.]" (R. 29, 32-33). She took FMLA leave from work when she had "a bad flare-up[.]" (R. 32). She used her spinal cord stimulator daily, took breaks every 15 to 20 minutes, and ultimately quit her job (in February 2016). (R.

11

28, 32-33, 180). Plaintiff's pain and symptoms had worsened in the prior year. (R. 30, 34). She had arthritis in both thumbs from typing. (R. 34). She felt pain in her cuticles; between her fingers; in her fingers "like they're broken[,]" which she described as a constant "jamming" or "stabbing" sensation even with the stimulator; and in her arms "like they're on fire or . . . in an oven[.]" (*Id.*). The pain could last for a day or a week. (*Id.*).

The stimulator limited Plaintiff's ability to bend and move. (R. 30, 34). The furthest she had walked in the prior month was for 15 to 20 minutes in the grocery store, then she would stop in the aisle for a minute due to pain and discomfort from the stimulator. (R. 31, 35). She had trouble standing for long periods of time because of her neck and the placement of the stimulator. (R. 31). She could sit for 15 to 20 minutes before she had to get up and move around for 20 to 25 minutes before sitting again. (R. 35-36).

Plaintiff could not do housework, wash clothes, sweep, mop, or vacuum. (R. 30). Washing dishes was "a challenge[,]" and she had broken dishes because she had "no grip" and they fell out of her hands. (*Id.*). Plaintiff could not go to the grocery store without her husband because she could only carry less than five pounds. (R. 30, 35). She did not always shower daily because it was "very hard" and "very painful[.]" (R. 31, 36). She had trouble using her hands or fingers for buttons and zippers. (R. 31). She did not need help getting dressed. (R. 36).

Plaintiff had medical insurance until November 2017 when her husband lost his job. (R. 37). She could no longer afford to fill any prescriptions as a result. (R. 37-38). Plaintiff was diagnosed with diabetes in the fall of 2017 and prescribed medications, which she did not take at that time because of her lack of insurance. (R. 38).

On examination by the ALJ, the ME listed Plaintiff's "severe" impairments as extreme morbid obesity and CRPS in both upper extremities, and he stated that the etiological basis of her bilateral shoulder pain was not presently documented by her treating sources.  (R. 38-42).  In discussing the CRPS, the ME explained that, after the February 25, 2016 alleged onset date, "[he] did not find the clinical findings of [CRPS] in the medical record, but [Plaintiff] continue[d] to have that diagnosis from treating pain clinic source [Dr. Lubenow]."  (R. 39, citing R. 276).  The ME noted that, as of April 27, 2016, Dr. Lubenow "felt [Plaintiff] could not do the activities of daily living."  (R. 39, citing R. 276).  The ME also mentioned that the battery of Plaintiff's stimulator was changed on August 10, 2016 (this record is dated August 1, not August 10, 2016).  (R. 41, citing R. 308).  The ME stated that he did "not have adequate pain clinic physician's information after . . . 11/10/2016[.]"  (R. 39, citing R. 304).  The ME also referenced "the last visit with the pain clinic physician . . . 11/10/2016."  (R. 41).  The ME continued: "So, I do not know whether she's following with the pain clinic subsequent to November 3, 2016 or not."  (R. 39-40).  The ME also stated that, after November 3, 2016, there was no documentation of stimulator adjustment; and, after November 3, 2016 or November 10, 2016 (the ME alternately used each date), he did not have documentation of prescriptions for "narcotics" or "analgesics other than Tramadol and Mobic" when previously Plaintiff took Hydrocodone or Norco in addition to the stimulator.  (R. 40-41).

According to the ME, following continued complaints of pain in both upper extremities and shoulders, on November 3, 2016 (this record is dated November 3, 2015, not 2016), Plaintiff was seen by an orthopedic surgeon, who administered a local steroid injection.  (R. 40, citing R. 365).  There was "no further follow-up" until October 17, 2017,

13

when she was seen for left shoulder pain, and the doctor planned to do further evaluation, including a CT scan. (R. 40-41, citing R. 321). The ME additionally noted that a right shoulder x-ray taken as part of the consultative examination was normal. (R. 41, citing R. 294).

When the ALJ asked if Plaintiff's impairments met or equaled a listed impairment, the ME testified:

> Listing would have it under 11.14 and I'm looking for persistent documentation of inability to preform [sic] activities of daily living. I only have one documentation. In the absence of pain clinic, will you -- whatever the reasons are we do not know. Subsequent to 11 Page [sic] 2016, total duration it was there on 11/10/2016, it's only seven months. And, therefore, I could the [sic] equal 11.14(b)(3).

(R. 42). The ME then opined that Plaintiff was limited to sedentary work with additional non-exertional limitations of: not climbing ladders, ropes, or scaffolds; not kneeling; not crawling; occasionally climbing ramps and stairs; occasionally balancing, stooping, and crouching; occasionally reaching overhead bilaterally; frequently reaching in all directions; frequently performing fine and gross manipulations; not working at unprotected heights; and occasionally being exposed to hazards such as large moving machinery and vibrations. (R. 42-43, 45).

In response to questions from the ALJ, the VE testified about the ability of a person of Plaintiff's age, education, and work experience who could perform work at the sedentary level and was limited to: not climbing ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; occasionally balancing, stooping, and crouching; occasionally reaching overhead; frequently reaching in all other directions; frequently handling and fingering; no exposure to unprotected heights; no exposure to dangerous machinery; and

concentrated exposure to vibrations. (R. 44-45). According to the VE, such a person could perform Plaintiff's past relevant work as a Claims Clerk. (R. 45).

## DISCUSSION

### I. Governing Standards

#### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the SSA. In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the applicable regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary

support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

### B. Five-Step Inquiry

To recover disability benefits under the SSA, a claimant must establish that she is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II.    Analysis

### A.    Listings

At step 3, a claimant bears the burden to prove that her medical condition met or equaled an impairment found in the Listing of Impairments.  *Anthony G. v. Saul*, No. 17 C 4393, 2020 WL 439964, at *4 (N.D. Ill. Jan. 28, 2020) (citing *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006)).   If a claimant has such an impairment, then she is presumptively eligible for benefits.  *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015) (citing 20 C.F.R. § 404.1520(d)); *see also Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Anthony G.*, 2020 WL 439964, at *4.  "While the Listings 'specify the criteria for impairments that are considered presumptively disabling . . . [a] claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing.'"  *Anthony G.*, 2020 WL 439964, at *4 (citing *Barnett*, 381 F.3d at 668); 20 C.F.R. §§ 404.1525(a), 404.1526(a).  "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing."  *Minnick*, 775 F.3d at 935 (citing *Barnett*, 381 F.3d at 668); *Anthony G.*, 2020 WL 439964, at *4.  A finding that a claimant's symptoms are medically equivalent to a listed impairment requires an expert opinion.  *Minnick*, 775 F.3d at 935-36 (citing *Barnett*, 381 F.3d at 670-71); *Anthony G.*, 2020 WL 439964, at *4.

Plaintiff challenges the sufficiency of the ALJ's step 3 finding.  (Doc. 14, at 10-11; Doc. 23, at 4-5).  The ALJ's decision devoted a single sentence to this finding, stating only that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments . . . ."  (R. 74).  The ALJ

failed to mention any specific Listing by name or to perform any analysis of the applicability of any Listing. (*See* R. 74; *see also* 77). This superficial step 3 finding falls short of even the sort of "perfunctory analysis" that the Seventh Circuit has "repeatedly found inadequate to dismiss an impairment as not meeting or equaling a Listing." *See Minnick*, 775 F.3d at 935-36 (remanding where ALJ dismissed possibility of plaintiff's degenerative disc disease meeting or equaling criteria of Listing 1.04 in two sentences and provided no supporting analysis whatsoever).

Plaintiff argues that, based on the ME's testimony, the ALJ should have addressed the applicability of Listing 11.14. (Doc. 14, at 10-11; Doc. 23, at 4-5). Listing 11.14 for peripheral neuropathy requires marked limitation in physical functioning and in one of four areas of mental functioning, in this case (as identified by the ME), concentrating, persisting, or maintaining pace. (R. 42). 20 C.F.R. § 404, Subpt. P, Appx. 1, §§ 11.00(G)(2), 11.00(G)(3)(b)(iii), 11.14(B)(3). A marked limitation in physical functioning "means that, due to the signs and symptoms of [a claimant's] neurological disorder, [the claimant is] seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities[.]" 20 C.F.R. § 404, Subpt. P, Appx. 1, §§ 11.00(G)(2)(a), 11.14(B). A marked limitation in mental functioning "means that, due to the signs and symptoms of [a claimant's] neurological disorder, [the claimant is] seriously limited in the ability to function independently, appropriately, effectively, and on a sustained basis in work settings[.]" 20 C.F.R. § 404, Subpt. P, Appx. 1, § 11.00(G)(2)(b). Concentrating, persisting, or maintaining pace "refers to the abilities to focus attention on work activities and to stay on-task at a sustained rate." 20 C.F.R. § 404, Subpt. P, Appx. 1, §§ 11.00(G)(3)(b)(iii), 11.14(B)(3). To meet the requirements of a listing, an impairment must

satisfy all of its criteria and meet the duration requirement. 20 C.F.R. § 404.1525(c)(3). Most listed impairments are permanent or expected to result in death. 20 C.F.R. § 404.1525(c)(4). Unless otherwise specified, the evidence must show that an impairment "has lasted or can be expected to last for a continuous period of at least 12 months." *Id.*

The ALJ gave the ME's opinion "great weight" and noted that he could "offer insight into the various ways a Listing might be met or equaled" (R. 77), but failed to discuss what insight the ME had offered regarding Listing 11.14. The parties agree that the issue here is whether the medical evidence demonstrates that Plaintiff's impairment satisfied the duration requirement of at least 12 months. (*See* Doc. 14, at 10-11; Doc. 22, at 8-9). In testifying about the possible applicability of Listing 11.14, the ME concluded that the documentation of Plaintiff's inability to perform activities of daily living spanned "only seven months" based on the ME's review of Dr. Lubenow's April 2016 and November 2016 pain clinic treatment records. (R. 39-42, citing R. 276, 304). Notably, the ME's testimony indicates that the "last" pain clinic record of Dr. Lubenow was dated November 2016. (R. 39, 41). But subsequent pain clinic records of Dr. Lubenow dated April 2017 and August 2017 also were part of the administrative record available before the ME and the ALJ. (R. 47-48, 76, 343-46).

At the beginning of the administrative hearing, Plaintiff's counsel sought the admission of purportedly additional treatment records of Dr. Lubenow from November 2016 to August 2017, and the ALJ deferred consideration of the matter until the end of the hearing. (R. 23-27, 47-48). At that time, counsel noted the ME's testimony that he did not "see anything after this one particular date from the pain clinic after 11 of 2016[,]" and counsel argued for the records' relevance to "fairly" evaluating Plaintiff's limitations

in use of her upper extremities and "perhaps meeting or equaling that listing 11.14 for the peripheral neuropathy." (R. 47-48). The ALJ then allowed submission of those records. (R. 48). The Court notes, however, that the supposedly additional records are duplicates of previously-admitted records. (*See* R. 23-27; *compare* R. 304-05, 341-47 *with* R. 497-500, 502-04).[5] As such, it is unclear why the ME's testimony did not address those records. The ALJ considered Plaintiff's 2017 treatment with Dr. Lubenow. (R. 76, citing R. 343, 345). Nonetheless, despite the apparent incompleteness of the ME's testimony, the ALJ's stated reason for according the ME's opinion great weight was that it was "based on a review [of] the entirety of the record." (R. 77).

Plaintiff contends that Dr. Lubenow's 2017 treatment records, in particular the August 2017 note that it had been "hard" for Plaintiff to perform activities of daily living, pertain to the analysis of whether her impairments lasted long enough to satisfy Listing 11.14. (Doc. 14, at 10-11, citing R. 345). The Commissioner's assertion (Doc. 22, at 7-10) that the ALJ had no reason to interpret a record documenting difficulty performing (as opposed to inability to perform) activities of daily living as conflicting with the ME's testimony is unavailing. The ALJ discussed the August 2017 treatment note, but not the part about Plaintiff's difficulties performing activities of daily living. (R. 76, citing R. 345-46). As a result, the Court has no way to know what conclusion (if any) the ALJ reached regarding Plaintiff's continued problems with activities of daily living. Absent any

---

[5]     The ALJ initially admitted Exhibits 1F to 10F (R. 264-496) of the administrative record. (R. 27). Following the ALJ's subsequent admission of more records (R. 48), the administrative record additionally includes Exhibits 11F and 12F (R. 497-563). Exhibits 3F and 7F (admitted at the beginning of the hearing) each contain Dr. Lubenow's November 2016 treatment notes, and Exhibit 7F also contains Dr. Lubenow's April 2017 and August 2017 treatment notes. (R. 304-05, 341-47). Exhibit 11F (admitted at the end of the hearing) also contains Dr. Lubenow's November 2016, April 2017, and August 2017 treatments notes. (R. 497-500, 502-04).

articulation of the listed impairment finding, the Court cannot discern how (if at all) the ALJ considered the ME's testimony or the impact (if any) of Dr. Lubenow's 2017 pain clinic records. *See Minnick*, 775 F.3d at 936 ("We cannot discern from the ALJ's scant analysis whether she considered and dismissed, or completely failed to consider, this pertinent evidence. If the ALJ did consider and dismiss some or all of this evidence, she never so stated.").

The Court also notes that the 2017 treatment records contradict another element of the ME's testimony. Specifically, the ME testified about the lack of documentation of narcotic (Norco or Hydrocodone) prescriptions after November 2016. (*See* R. 40-41). While in April 2016 and August 2016, Dr. Lubenow refilled Plaintiff's prescription for Norco, in November 2016, he did not and did not list Norco as a current medication. (R. 277, 304-07). But, throughout 2017, Plaintiff reported to both Dr. Lubenow and Dr. Hill (whose October 2017 treatment notes the ME addressed) that she continued to take Norco/Hydrocodone. (R. 324, 326-27, 343, 345). Toxicology results ordered by Dr. Lubenow confirmed this, and the doctor consistently listed Norco as a current medication and continued to refill Plaintiff's prescription for Norco. (R. 343-46, 358). Because the ALJ's decision did not address such evidence of Plaintiff's ongoing use of narcotic pain medication, the Court cannot determine how (if at all) it factored into the ALJ's consideration of the ME's testimony and the applicability of the Listing.

For the foregoing reasons, this case is remanded for further proceedings consistent with this opinion to reexamine the applicability of the Listings and to obtain updated ME testimony as appropriate.

**B.    Remaining Arguments**

The ALJ also should take the opportunity on remand to assess all of the medical, opinion, and testimonial evidence of record and to obtain updated VE testimony as appropriate.

<u>**CONCLUSION**</u>

For the reasons stated above, Plaintiff's request for remand (Doc. 14) is granted as outlined above, and the Commissioner's Motion for Summary Judgment (Doc. 21) is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Social Security Administration for further proceedings consistent with this Order.

ENTER:

Dated: July 20, 2020

SHEILA FINNEGAN
United States Magistrate Judge